IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

JACKIE J. PHINNESSEE,

    Plaintiff,

v.                                                       No. 09-1084

YOUNG TOUCHSTONE CO.,

    Defendant.
_____

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
_____

*INTRODUCTION*

        The Plaintiff, Jackie J. Phinnessee, initially brought this action against the Defendant, Young Touchstone Company ("Young Touchstone"), in the Circuit Court for the Twenty-Sixth Judicial District at Jackson, Tennessee on March 24, 2009, alleging retaliation under Tennessee state law. The matter was removed to this Court on April 3, 2009 on diversity of citizenship grounds. Before the Court is the Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

*STANDARD OF REVIEW*

        Rule 56 provides in pertinent part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." American Civil Liberties Union of Ky. v. Grayson County, Ky., 591 F.3d 837, 843 (6th Cir. 2010), *reh'g denied*, 605 F.3d 426 (6th Cir. 2010) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106

S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). "The opposing party must present more than a 'mere scintilla' of evidence; the evidence must be such that a reasonable jury could find for the non-movant." <u>Defoe ex rel. Defoe v. Spiva</u>, 625 F.3d 324, 330 (6th Cir. 2010) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" <u>In re Morris</u>, 260 F.3d 654, 665 (6th Cir. 2001) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have the effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect application of [the] appropriate principle of law to the rights and obligations of the parties." <u>Midwest Media Prop. L.L.C. v. Symmes Twp., Ohio</u>, 503 F.3d 456, 469 (6th Cir. 2007), *reh'g en banc denied* (Jan. 10, 2008) (citation omitted).

*FACTS*

The following material facts are undisputed for purposes of the instant motion unless otherwise indicated. Young Touchstone operates a facility in Jackson, Tennessee at which it manufactures radiators and cooling systems for train locomotives and earth movers. (Aff. of Andrew Deakins[1] ("Deakins Aff.") ¶ 2.) The Plaintiff worked at the plant from April 17, 2006 to April 8, 2008 as an at-will employee. (<u>Id.</u> ¶ 4.) On March 12, 2007, he received a written warning for unsatisfactory work quality from his supervisor, Mike Ruth. (Dep. of Jackie J. Phinnessee I

---

[1] Deakins is Young Touchstone's director of human resources and safety. (Deakins Aff. ¶ 1.)

("Phinnessee Dep. I") at 64-65, 71 & Ex. 15.)

On April 30, 2007, Phinnessee sprained his right hand at work. (Dep. of Andrew Lee Deakins ("Deakins Dep."), Ex. 4, Affidavit of Jackie J. Phinnessee ("Phinnessee Aff.") ¶ 4 & Ex. A.) The injury was not reported until May 16, 2007. (Phinnessee Aff., Ex. A.) In an affidavit filed contemporaneously with his response to the motion for summary judgment, the Plaintiff stated that, although he did not request to see a doctor at the time, he did so approximately a week afterward and was refused. (Phinnessee Aff. ¶ 4.) This assertion is denied by the Defendant. *See infra*.

A second written warning was issued to Phinnessee on July 19, 2007 by Eric Grimes, area coordinator for the facility's second shift,[2] and David Zabarkus,[3] area coordinator for the fabrication department, for unsatisfactory work quality. (Phinnessee Dep. I, Ex. 11, Aff. of Eric Grimes ("Grimes Aff.") ¶ 2.[4]) On or about September 19, 2007, Phinnessee was moved from the fin and tube department, where he was an assembler, to a fabrication operator position in the fabrication area. (Deakins Aff. ¶ 5.) His new job required him to lift up to fifty pounds repeatedly. (Aff. of David Zabarkus ("Zabarkus Aff.") ¶ 2.)

In his affidavit, the Plaintiff averred that the problems continued with his right arm and eventually the left began exhibiting the same symptoms. (Phinnessee Aff. ¶ 6.) He stated therein that he asked to see a physician several more times. (Id.) Grimes and Zabarkus issued a third

---

[2]Grimes held this position from August 2005 to August 2008, when he became the second shift superintendent. (Grimes Aff. ¶ 2.)

[3]Zabarkus was Ruth's successor. (Phinnessee Dep. I at 21-22.)

[4]In his response to the motion for summary judgment, the Plaintiff objected to the affidavit of Grimes on the grounds it was neither dated, attested to or notarized. He also noted that attestation on the affidavit of Young Touchstone Plant Manager Matthew Warnick was undated. Thereafter, the affidavits were corrected and refiled with the Court.

3

warning to Phinnessee on January 7, 2008 for unsatisfactory work performance. (Phinnessee Dep. I, Ex. 12.) On January 9, 2008, Phinnessee complained of pain in his arms and wrists, upon which a Tennessee Department of Labor "First Report of Work Injury or Illness" document was prepared and a list of medical providers issued to him. (Deakins Aff. ¶ 6 & Ex. 1.) The date of injury was listed as January 9, 2008. (Deakins Aff., Ex. 1.) Deakins denied knowledge of any complaints made by Phinnessee of problems with his right hand between May 2007 and January 2008. (Deakins Dep. at 37-38.) According to Zabarkus, the Plaintiff reported various physical complaints to him over time, upon which he always referred the Plaintiff to human resources. (Dep. of David Zabarkus ("Zabarkus Dep.") at 46.)

Phinnessee selected from the list Sports Orthopedic and Spine in Jackson, Tennessee. (Id. ¶ 6 & Ex. 2.) On January 22, 2008, he received a fourth written warning from Zabarkus for failure to follow instructions. (Phinnessee Dep. I, Ex. 13.) On January 30, Plaintiff was examined by Stephen W. Houseworth, M.D. at Sports Orthopedic and Spine and advised the doctor that he had suffered an injury at work seven months earlier after catching a forty-five pound weight with his right hand, the resulting pain of which had persisted since that time. (Tele. Dep. of Stephen W. Houseworth, M.D. ("Houseworth Dep.") at 9.) The physician diagnosed right carpal tunnel syndrome and placed him on the following restrictions: occasional use of heavy gripping and no lifting over fifteen pounds overhead. (Phinnessee Dep. I, Exs. 1 & 2.) These restrictions were continued until March 15, 2008. (Id., Ex. 2.) Dr. Houseworth also recommended a right carpal tunnel release procedure. (Id.) On March 5, 2008, the physician restricted the Plaintiff to occasional use of the right hand and arm and extended the period of restricted duty to April 1, 2008. (Id., Ex. 3.) During his pre-operative appointment on March 12, 2008, Dr. Houseworth restricted Phinnessee

to no use of the right arm and hand and again extended the restriction period to April 15, 2008. (Id., Ex. 4.) Carpal tunnel release surgery was performed March 17, 2008 by Dr. Houseworth, immediately after which Phinnessee returned home. (Id. at 31-33, Dep. of Jackie J. Phinnessee II ("Phinnessee Dep. II") at 53.) Post-operative notes reflected that the Plaintiff was not to use his right hand through April 30, 2008. (Id., Ex. 5.)

The Defendant knew of the work restrictions and placed Phinnessee on light duty assignments. (Aff. of David Zabarkus ("Zabarkus Aff.") ¶¶ 3-4.)[5] On one of the assignments

---

[5] Phinnessee argues in his response to the motion that Zabarkus' affidavit, as well as that proffered on behalf of Jennifer Murphy, Young Touchstone's human resources coordinator, are not in compliance with Rule 56(c) in that they contain hearsay statements and lack proper foundation for admissibility. Fed. R. Civ. P. 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Although Phinnessee did not elaborate on his objection to the affidavits, a review thereof reflects that they did not contain specific language indicating they were made on personal knowledge. However, "[w]hether an affidavit meets the requirements of personal knowledge and competence can be inferred from its contents." Bell v. City of Cleveland, No. 1:07CV3224, 2009 WL 248375, at *1 (N.D. Ohio Feb. 3, 2009) (quoting Jacobs v. Wilkinson, No. 97-3818, 1998 WL 393789, at *1 (6th Cir. June 15, 1998)); *see also* Edwards. v. Toys "R" Us, 527 F. Supp. 2d 1197, 1201-02 (C.D. Cal. 2007); Credentials Plus, LLC v. Calderone, 230 F. Supp. 2d 890, 904 (N.D. Ind. 2002).

As it is most relevant to the facts at issue, the Court notes that Zabarkus stated in his affidavit as follows:

> I recall Phinnessee being placed on work restrictions by his doctor in early 2008, where he had limited use of his right hand and a lifting restriction of 15 pounds. Like I do with any employees who have restrictions, I made accommodations to the job duties and instructed him not to do anything outside the doctor's restrictions.
>
> I personally weighed the parts that he would be handling to make sure they were within his restrictions. If we do not have tasks the employee can do within the employee's regular job, then the Company tries to find some light duty assignments within his restrictions somewhere else in the plant. Until about mid-March 2008 we were able to keep him working in the Fabrication Dept. on

5

following his surgery, the Plaintiff was required by Zabarkus to write down part numbers. (Phinnessee Dep. I at 59, 104.) Since he could not use his left hand, the supervisor told him to use his left. (Id.) According to Phinnessee, when the handwriting was illegible, Zabarkus became angry. (Id.)

The Plaintiff avers his physician advised him orally that he would be off work March 17 and 18. (Id. at 38-39.) On March 13, 2008, he submitted a written request for vacation for March 19 and 20, 2008, which was approved. (Id., Ex. 24; Aff. of Jennifer Murphy ("Murphy Aff.") ¶ 3.) Friday of that week was a holiday. The idea was that Phinnessee would be off the entire week so he could recuperate. (Phinnessee Dep. I at 107.) However, Phinnessee's sister died suddenly on March 14, 2008. (Id. at 40-41, 48.) According to Grimes' affidavit, he received a voice message from the Plaintiff on March 16, 2008 advising of his sister's death and asking if he could change his vacation to bereavement leave. (Grimes Aff. ¶ 4.) Grimes later played the recording for Deakins, who had the same recollection regarding its content. (Id. ¶ 5; Deakins Aff. ¶ 8.) Phinnessee was

---

> Second Shift. Once his restrictions changed to no use of his right hand then he was given various light duty assignments on first shift. I had him count parts and mark the part numbers with his left hand, but he complained that he could not write with his left hand. He went back to the doctor and his restriction was changed to include limitations to his left hand. We accommodated those restrictions by finding various jobs he could do within the doctor's restrictions. . . .

(Zabarkus Aff. ¶¶ 3-4.) These statements do not require the Court to infer personal knowledge; rather, the affidavit sets forth Zabarkus' participation in the events he describes. *See* Bell, 2009 WL 248375, at *1 (court need not infer personal knowledge where affiant stated he saw what was described). Nor are the statements hearsay, as they do not relate what the affiant was told by another. *See* Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.") Accordingly, the Plaintiff's objection is without merit.

referred to the human resources department. (Grimes Aff. ¶ 5.) Plaintiff vehemently denies that he asked Grimes if he could cancel his vacation, which he wanted to remain as scheduled, and insists he requested permission to take bereavement leave for March 24 through 26. (Phinnessee Dep. I at 42.) Phinnessee spoke with Murphy, after which it is undisputed she accessed the company's payroll system, cancelled the Plaintiff's vacation for March 19 and 20, and input three days bereavement leave for those dates. (Murphy Aff. ¶ 5.) Murphy recalled that she confirmed with the Plaintiff at the end of their conversation that he would have bereavement leave "on Monday, Tuesday and Wednesday and that we would see him Thursday." (Id. ¶ 4.) Phinnessee's payroll records reflected three days pay for bereavement leave the week beginning March 17, 2008. (Deakins Aff. ¶ 10 & Ex. 3.) There is no vacation pay indicated on the payroll records for that week. (Deakins Aff. ¶ 10 & Ex. 3.)

Young Touchstone company policy requires employees who are not coming to work to call their supervisor or the human resources department. (Murphy Aff. ¶ 6.) Phinnessee did not work on March 20, 2008. (Id.) The plant was closed the following day for the Good Friday holiday. (Deakins Aff. ¶ 12.) It is undisputed that he did not return to work until March 27, 2008. (Id. ¶¶ 12-13; Phinnessee Dep. I at 52-54.)

Murphy stated in her affidavit that the Plaintiff told her the doctor had taken him off work following his surgery and that the bereavement leave was for the next week. (Murphy Aff. ¶ 9.) She denied receiving anything from the doctor indicating Phinnessee would be off work March 17 and 18. (Id.) On March 27, 2008, the Plaintiff met with Murphy, Deakins, Zabarkus and Plant Manager Matt Warnick. (Deakins Aff. ¶ 14; Phinnessee Dep. I at 54.) During the meeting, Phinnessee was told that he had been expected to be at work on March 20 and 24 through 26. (Deakins Aff. ¶ 14;

Phinnessee Dep. I at 55-56; Aff. of Matthew Warnick ("Warnick Aff.") ¶ 5.) Deakins remembered that, although the Plaintiff claimed that his doctor had taken him off work following the surgery and that his bereavement leave was for Monday, Tuesday and Wednesday of the next week, Murphy was adamant that this was not the understanding reached between the two and that he was supposed to be back at work on March 20. (Deakins Aff. ¶ 14.) It was Phinnessee's impression after the meeting that Murphy had apparently misunderstood him during their telephone conversation concerning leave. (Phinnessee Dep. I at 112-13.) Deakins denied the company had knowledge prior to the meeting that the Plaintiff had been taken off work after the March 17 surgery. (Deakins Aff. ¶ 14.)

Murphy averred in her affidavit as follows:

> I contacted Nell Bullock [workers compensation coordinator] at Sports Orthopedic and Spine and told her we needed documentation on Phinnessee's status after his surgery on March 17, and specifically needed to know if his doctor had taken him off work. After several days of not getting a response it was finally confirmed on or about Monday April 7, 2008, that his doctor had not taken him off work. I relayed this information to Mr. Deakins and David Zabarkus, Phinnessee's supervisor.

(Murphy Aff. ¶ 10.) Phinnessee conceded that he did not provide Young Touchstone with documentation, but explained that, when he attempted to obtain it on March 27, 2008, Dr. Houseworth was out of the country. (Phinnessee Dep. I at 56-57.) A fifth written disciplinary warning was prepared on April 7, 2008 by Zabarkus regarding the Plaintiff's failure to report for or call in to work on March 20, 24, 25 and 26, 2008. (Deakins Aff. ¶ 21-22.)

Dr. Houseworth could not recall whether he took the Plaintiff off work after his surgery. (Houseworth Dep. at 20, 22-23.) He explained in his deposition that he usually, but not always, orally advises patients that they should be off work after surgery for one to two weeks, with no reflection of the instruction in his notes. (Id. at 35, 52, 54.) Dr. Houseworth added that, when a carpel tunnel release patient was to be taken off work, there was a form routinely used by the clinic,

prepared by Bullock at his instruction, to document the duration of that period. (Id. at 36.) He could find nothing in his notes to suggest that such a form existed in this case. (Id. at 36-38.)

He also had no recollection of conversations with anyone at the clinic concerning Phinnessee being off work following the right hand surgery or his separation from Young Touchstone. (Id. at 38-40.) Dr. Houseworth had no knowledge of the reasons for the Plaintiff's separation and never spoke with a representative of the Defendant. (Id. at 42.) The physician did remember, however, speaking with Bullock about whether the Plaintiff was working. (Id. at 40.) Phinnessee testified in his deposition that he told Dr. Houseworth he was fired because he did not have a note for his absence on March 18.[6] (Phinnessee Dep. I at 105-06.)

According to Bullock, she normally does not speak directly with employers in workers' compensation situations because the clinic issues a work status document to be submitted to the employer's human resources contact by the patient. (Dep. of Nell Bullock ("Bullock Dep.") at 9.) On March 12, 2008 during his pre-operative appointment, Phinnessee was given a work status report which contained work restrictions but did not include any statement that he was taken off work on March 18. (Id. at 13; Phinnessee Dep. I, Ex. 4.) Although she spoke with a representative of Young Touchstone concerning Phinnessee, Bullock could not recall discussing whether he was taken off work on March 18, 2008. (Bullock Dep. at 10-11, 16-18, 35-36.) She did, however, send an email to the Defendant's workers' compensation carrier on April 2, 2008 in which she advised that "Dr. Houseworth's nurse asked Dr. Houseworth today about the time off after surgery that Mr.

---

[6]In his deposition, Dr. Houseworth identified a handwritten note in his file dated April 8, 2008, stating "Needs off from 3/17 to 3/18. Patient didn't take off today." (Houseworth Dep. at 50.) The remainder of the note was illegible. (Id. at 40.) No additional information was adduced in his deposition or elsewhere concerning the note.

9

Phinnessee told Jennifer about. Dr. Houseworth said what was on the work status is the correct status. He did not discuss that with the patient on the day of surgery." (Id. at 28, 30 & Ex. 2.) Bullock could not recall forwarding a separate copy of the email to anyone at Young Touchstone. (Id. at 29.) She could locate nothing in Phinnessee's file to support his claim that he was given March 18 off work. (Id. at 32-33, 36-37.)

Phinnessee returned to the clinic on April 1, 2008 and was seen by Dr. Garth B. Wright, who restricted him to a sitting job and from using either hand. (Id. at 58-59.) He eventually had a similar surgerical procedure performed on his left hand. (Id. at 15, Houseworth Dep. at 24-25.)

It is undisputed that Young Touchstone has a policy and practice that receipt of four written warnings within a twelve-month period may result in dismissal. (Deakins Aff. ¶ 23 & Ex. 5.) In calculating the number of warnings issued to Phinnessee for purposes of his termination, the March 2007 warning was not counted because, according to the Defendant, there were questions about the incident and neither Ruth nor the then plant manager were still in Young Touchstone's employ at the time of Plaintiff's discharge. (Dep. of Matt Warnick ("Warnick Dep.") at 7-8; Zabarkus Dep. at 25-35.) Warnick contends that he made the decision to terminate Phinnessee's employment based on his belief that the Plaintiff had accumulated four warnings within a twelve-month period. (Warnick Aff. ¶ 3.) Specifically, Warnick believed that Phinnessee's explanation for his absences still did not account for his absence on March 18, 2008 in light of information obtained by the Defendant that he had not in fact been taken off work for that day. (Id. ¶ 5.) As he saw no reason to exempt the Plaintiff from the policy, Warnick fired him. (Id. ¶ 6.)

Young Touchstone's employee handbook provides that "[i]f during any consecutive 12 months, you accumulate a total of eight (8) full occasions, your employment with Young Touchstone

will be subject to termination." (Deakins Aff, Ex. 5 at 74.) An "occasion" of absence is defined in the handbook as "four (4) or more hours in any workday." (Id.) Days taken off for workers' compensation injuries are not "occasions" for purposes of applying the attendance policy. (Id.) According to the handbook, the Defendant's absentee progressive discipline system requires that a written reminder be issued at the time an employee accrues four occasions in a twelve-month period. (Id., Ex. 5 at 75.) At the accrual of six and seven occasions in a twelve-month period, the employee receives a written warning in the personnel file. (Id.)

In his deposition, the Plaintiff acknowledged that he had received four warnings within a twelve-month period. (Phinnessee Dep. at 63.) In his affidavit, Phinnessee submits that as of January 1, 2008 he had no occasions on his attendance record. (Phinnessee Aff. ¶ 11.) Afterward, however, he was issued "occasions" for missing work for doctor appointments associated with his work-related injury. (Id. ¶¶ 12-16.) Nor did he receive a written reminder in accordance with the policy upon accumulating four occasions in a twelve-month period as of March 12, 2008. (Id. ¶ 18.)

*ARGUMENTS OF THE PARTIES AND ANALYSIS*

It is Phinnessee's position that he was fired because he filed a workers' compensation claim for his May 2007 injury. "With significant exceptions, an employee or an employer may terminate an employment-at-will relationship at any time, with or without good cause." Conatser v. Clarksville Coca-Cola Bottling Co., 920 S.W.2d 646, 647 (Tenn. 1995) (citation omitted). However, "an employee's ability to file a retaliatory discharge claim when his or her employment is terminated for filing a workers' compensation claim [under the Tennessee Workers' Compensation laws] is recognized as a narrow exception to the employment at will doctrine." Newcomb v. Kohler Co., 222 S.W.3d 368, 389 (Tenn. Ct. App. 2006), *app. denied* (Jan. 29, 2007) (citing Clanton v. Cain-Sloan

11

Co., Inc., 677 S.W.2d 441, 445 (Tenn. 1984)).

In cases of retaliatory discharge in Tennessee, a plaintiff must establish

(1) that an employment-at-will relationship existed;

(2) that the employee was discharged;

(3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and

(4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy.

Kinsler v. Berkline, LLC, 320 S.W.3d 796, 800 (Tenn. 2010) (quoting Gossett v. Tractor Supply Co., Inc., 320 S.W.3d 777, 781 (Tenn. 2010)).  In Kinsler, the Tennessee Supreme Court articulated that "[a]t trial, [the plaintiff] must show that [his exercise of protected rights] was a substantial factor in [the defendant's] decision to discharge him.  [Such exercise] would constitute a substantial factor in [the] decision if [it] was an important or significant motivating factor for the discharge."  Id. (internal citations & quotation marks omitted).  "Proof of discharge without evidence of a causal relationship between the claim for benefits and the discharge does not present an issue for the jury."  Goodbar v. Technicolor Videocassette of Mich., Inc., No. 09-2553, 2010 WL 5464796, at *10 (W.D. Tenn. Dec. 30, 2010) (quoting Anderson v. Standard Register Co., 857 S.W.2d 555, 558-59 (Tenn. 1993)).

The dispute in this case focuses on causation.  Both parties have cited to Newcomb, in which the Tennessee state court articulated that

[i]n an effort to prove causation, a plaintiff can present circumstantial evidence in numerous forms, to include the employer's knowledge of the compensation claim, the expression of a negative attitude by the employer toward an employee's injury,

12

> the employer's failure to adhere to established company policy, discriminatory treatment when compared to similarly situated employees, sudden and marked changes in an employee's performance evaluations after a workers' compensation claim, or evidence tending to show that the stated reason for discharge was false.

Newcomb, 222 S.W.3d at 391 (citations omitted).  Evidence of causation requires "direct evidence or compelling circumstantial evidence." Smith v. C.R. Bard, Inc., ___ F. Supp. 2d ___, 2010 WL 3122793, at *15 (M.D. Tenn. Aug. 9, 2010) (citation omitted).  The fact that one followed the other is not sufficient to establish the causation element. Hall v. Wal-Mart Stores East, LP, 637 F. Supp. 2d 588, 599 (M.D. Tenn. 2009) (citation omitted).  Moreover, a "plaintiff's subjective beliefs, mere speculation, or testimony that the employee can think of no other reason for the discharge cannot, in and of themselves, create the requisite causal relationship."  Newcomb, 222 S.W.3d at 391 (citations omitted).

The Plaintiff has identified the following evidence as supportive of the causation element of his claim:  (1) a dispute over his true return to work date; (2) assigning him an "occasion" for his pre-operative appointment; (3) assigning him an "occasion" for absence after surgery; (4) discipline January 7 and 22, 2008; (5) Defendant's failure to follow its policy and issue a written reminder of occurrences; (6) Young Touchstone's refusal to provide him timely medical treatment for his work related injury; (7) the fact that Zabarkus could not identify anyone who had kept his job following a workers' compensation award; and (8) difference in treatment after injury.  Without opining on the Defendant's objection to the eleventh-hour assertion of certain of the foregoing, the Court will address them seriatim.

At the outset, the Court notes that the only evidence in the record of Phinnessee's alleged requests for medical treatment after his May 2007 injury and the Defendant's refusal thereof is contained in his affidavit, despite a lengthy deposition which exhaustively covered such issues.

Phinnessee cannot now create a fact issue where none existed prior to his affidavit. Aerel, S.R.L. v. PCC Airfoils, L.L.C., 371 F. Supp. 2d 933, 942 (N.D. Ohio 2005), *aff'd* 448 F.3d 899 (6th Cir. 2006), *reh'g denied* (June 20, 2006) (citation omitted) ("the fact that a party has had ample opportunity during discovery to present evidence provides courts with reason to prevent that party from introducing new evidence in an affidavit opposing summary judgment"). Indeed, the Plaintiff's deposition testimony consistently revealed that he believed the alleged retaliation began not in May 2007 but after January 9, 2008 when he reported that his hands hurt. This is problematic for the Plaintiff, particularly because he received three written warnings prior to January 9, 2008. Clearly, he could not have been retaliated against *prior* to his exercise of protected rights. Nor can he argue that he began to receive disciplinary warnings only after his injury. Phinnessee also contends in his response to the instant motion that he received positive performance evaluations prior to his injury but, beginning in October 2007, his evaluations turned negative. Not only is this assertion troublesome for the same reason as the warnings discussed above, but no evidence of performance evaluations, positive or otherwise, has been submitted to the Court.

With respect to his contention that he was assigned an "occasion" for his pre-operative appointment on March 12, 2008, the Plaintiff cites to Exhibit 6 of Deakins' affidavit - his attendance record.[7] While the document does in fact reflect that he received one "occasion" for that day, his total balance of "occasions" for the period from March 2007 to March 2008 was ten. (Deakins Aff., Ex. 6.) Thus, even without that "occasion," he still accrued in excess of six, which was sufficient

---

[7]The Defendant maintains that Phinnessee received an "occasion" for March 12, 2008 because he did not provide, and has not provided, documentation indicating the absence was for a work-related injury, pointing out that he was working second shift at the time which would not necessarily have required him to miss work to keep a doctor appointment.

14

to justify a written warning.  (*See* id., Ex. 5 at 75.)

As for the Plaintiff's absence from work on March 18, 2008, the evidence reveals that this occurrence figured prominently in Young Touchstone's decision to terminate him.  Phinnessee submits that this constitutes evidence of retaliatory motive because Dr. Houseworth normally took patients off work for ten days to two weeks after surgery.  It is undisputed that this instruction was verbal.  The Plaintiff also insists that he attempted to obtain written documentation of the instruction, but Dr. Houseworth was out of the country.  The problem is that there is no evidence anyone at Young Touchstone knew these facts prior to his termination.  Bullock testified in her deposition that she could glean no evidence from the medical records that Phinnessee was to take March 18, 2008 off and that she so advised Young Touchstone's workers' compensation carrier. Viewing the evidence in the light most favorable to Phinnessee, it is undisputed Young Touchstone received no evidence, documentary or otherwise, from the physician that Plaintiff was instructed not to go to work on March 18, 2008 due to his work-related injury.  It is further uncontroverted that Dr. Houseworth's office advised the Defendant's workers' compensation carrier that there was nothing in the file to indicate he had been taken off work.  The Plaintiff has cited to no case holding that an employer's failure to take the employee's word alone, absent documentation from the physician, is sufficient to create a factual dispute.  Thus, in the Court's view, Young Touchstone's determination that Phinnessee's March 18 absence was unexcused based on the lack of supporting documentation falls short of constituting direct or compelling "evidence tending to show that the stated reason for discharge was false" under Newcomb.[8]

---

[8]Phinnessee's assertion that he was assigned "occasions" only after January 2008 is of dubious benefit to his retaliation claim.  As noted herein, "occasions" are only assigned if an employee is absent more than four hours in one day. (*See* Deakins Aff., Ex. 5 at 74.)  If the

15

Phinnessee argues that the temporal proximity of his January 22, 2008 disciplinary warning to his exercise of protected rights constitutes direct evidence of retaliation. However, "[w]hile not alone sufficient, temporal proximity may . . . serve as evidence of causation *if the plaintiff's prior job performance was otherwise satisfactory.*" Hall, 637 F. Supp. 2d at 599 (citation omitted) (emphasis in original). It is without dispute that the Plaintiff received three disciplinary warnings for work-related issues prior to January 22, 2008. Consequently, as his "prior job performance was not otherwise satisfactory, temporal proximity between the claim and termination does not serve as proof of causation." *See* id. at 601 (citation omitted). In addition, the retaliatory nature of the January 22, 2008 discipline is belied by the fact that it would have constituted the Plaintiff's fourth written warning in a twelve-month period if his superiors had chosen to count the March 12, 2007 written warning. Thus, if Young Touchstone were looking for a reason to fire him, it could have done so in January 2008.

The Plaintiff posits that Young Touchstone's failure to issue a written reminder in accordance with the handbook after his fourth "occasion" on March 12, 2008 evidences retaliation. However, Newcomb does not hold that every failure of an employer to adhere to company policy establishes a prima facie case of retaliation. Rather, evidence must be direct or compelling proof of unlawful conduct. *See* Smith, 2010 WL 3122793, at *15. There is simply no proof that the reminder was not issued for any nefarious reason. Nor is there evidence to suggest, had a reminder been issued on March 12, 2008, that Phinnessee would have been at work on any of the days for which he later received "occasion" points. Finally, there is no indication when a written reminder would have been

---

employee was not absent more than four hours in one day, the Court assumes no "occasion" would be recorded. The Plaintiff has not alleged that he was absent before his injury and, on those dates, no "occasion" was assigned.

issued. The Plaintiff was off work just a few days later on March 17 and 18, by which time he had acquired sufficient additional points to warrant the next level of discipline -- a written warning.

Deakins stated in his affidavit that the policy of terminating employees who acquire four written warnings within a one-year period has been consistently applied and that, since January 1, 2007, twenty-six individuals, not including the Plaintiff, have been discharged from the Jackson facility pursuant to the policy. (Deakins Aff. ¶ 23.) Eight of those terminations occurred between January 1, 2007 and April 8, 2008, the date of Phinnessee's firing. (Id. ¶ 26.) Deakins also asserted that none of the sixty-eight employees discharged between April 9, 2005 and April 9, 2008 had filed a workers' compensation claim for an injury occurring within ninety days of their termination. (Id. ¶ 27.) "The Tennessee Supreme Court has stated repeatedly, if an employer-defendant has a global and neutral policy, i.e. an absenteeism policy, and applies it in a non-discriminatory manner to discharge a plaintiff, no retaliation claim will prevail." Ellis v. Buzzi Unicem USA, No. 1:06-CV-96, 2007 WL 1464594, at *9 (E.D. Tenn. May 16, 2007), aff'd 293 F. App'x 365 (6th Cir. 2008) (citations omitted). The Plaintiff has offered nothing to rebut Deakins' statements, pointing out only that, in his deposition, Zabarkus acknowledged he could think of no one who filed a workers' compensation claim and received a settlement who was still in the employ of Young Touchstone. (Zabarkus Dep. at 41.) However, while Deakins was the human resources director, Zabarkus was coordinator of the fabrication department. No evidence has been presented that the latter was in a position to know, or had any knowledge of, the company's workers' compensation settlements.

Phinnessee has also cited as evidence of retaliation the change in his relationship with his supervisors. He maintains in his post-deposition affidavit that, prior to his injury, Deakins, Warnick and he freely talked through their concerns, but afterward, they discussed nothing with him except

17

his work performance and discipline. (Phinnessee Aff. ¶ 20.) In addition, he submits that, from January 2008 until his termination, the occasions in which he saw Zabarkus increased from an average of three days per week to three to five times a day. (Id. ¶ 19.) Zabarkus also checked the Plaintiff's work after his injury, which he had never done before. (Id.) In his deposition, Phinnessee averred that "I just feel that after I started going getting my hands checked on, after I had the surgery, things changed. That's the way I feel. I feel that things changed after the surgery to the hands and after I hurt my hands." (Phinnessee Dep. I at 103.) When asked if there were other ways in which things changed after the injury, the Plaintiff responded as follows:

> I couldn't possibly tell you all the ways, sir. I can't remember all of them. They come to me -- they come and go. But as far as I can remember right now I know it changed as in -- it changed with me and Mr. [Deakins] there.
>
> Before when I would go to talk to him and ask him questions about certain things, he was more kind and nice to me. Sort of kind of nice. But later on he became kind of short and somewhat rude. Mr. Zabarkus was the same way.
>
> The plant manager really always was kind of different. He didn't really speak to too many people out on the floor. He didn't really carry on conversations with many people. Only people that I ever seen him talk to was Mr. [Deakins], and Matt, and some of the other supervisors.
>
> But I just noticed change as in -- I had seen another individual out there that had had carpal tunnel surgery and I seen the way they had him working doing -- checking off stuff and doing certain things. When it came to me, they wanted me to go inside -- we have towers of skids that sit on top of each other. Steel skids. I got to go and squeeze through all these things and try to do that with a hand where the doctor told me to keep my hand elevated . . .
>
> So I -- that was another change. Dave's attitude toward me had changed. I just -- it was a lot of little things that he acted differently than he had been. And seem like some of the employees didn't even want to come around that area. I don't know. It just -- a lot of things changed.

(Id. at 110-11.) The Plaintiff was asked specifically if there was any reason he could think of that led him to believe Warnick was not telling him the truth about his termination, to which Phinnessee

18

replied, "Only thing I can say about that, sir, is things changed after I hurt myself out there at that factory working on those machines. That's all I can say about that." (Id. at 106.)

The Plaintiff's assertions do not constitute sufficient evidence of the expression of a negative attitude toward the employee. In Newcomb, the plaintiff offered corroborated testimony that, after he returned to work, his supervisor harassed him about his injury and his decision to sue the employer for benefits, as well as testimony of his former supervisor that he was instructed by management to keep an eye on the plaintiff because of the suit and to look for a reason to "get rid of him." Newcomb, 222 S.W.3d at 392. The Plaintiff's contentions are nowhere near that proffered in Newcomb and, instead, fall into the category of "subjective beliefs, mere speculation, or testimony that the employee can think of no other reason for the discharge" rejected by the Newcomb court. *See* id. at 391.

For these reasons, the Court finds that the Plaintiff has failed to demonstrate a causal connection between his exercise of workers' compensation rights and his termination, and, thus, has not established a prima facie case of retaliation. Accordingly, the Court need not address the parties' arguments concerning the application to this case of the Tennessee Supreme Court's recent decision in Gossett.

## *CONCLUSION*

The Defendant's motion for summary judgment is GRANTED and this matter is DISMISSED in its entirety. The Clerk is DIRECTED to enter judgment for the Defendant.


IT IS SO ORDERED this 20th day of January 2011.

                                                  s/ J. DANIEL BREEN
                                                  UNITED STATES DISTRICT JUDGE